

FILED

**Margaret Botkins**
**Clerk of Court**

4:07 pm, 1/12/26

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

TRI COUNTY TELEPHONE
ASSOCIATION, INC.,
a Wyoming corporation,

        Plaintiff,

      vs.

TWIN CITY FIRE INSURANCE
COMPANY and THE HARTFORD
INSURANCE GROUP d/b/a HARTFORD
FINANCIAL PRODUCTS,

        Defendants.

Case No.  24-CV-274-R

---

**ORDER ON COMPETING MOTIONS FOR SUMMARY JUDGMENT [33 & 36] AND
DEFENDANTS' MOTION TO STRIKE [41]**

---

       This matter is before the Court on competing Motions for Summary Judgment. [ECF

Nos. 33 & 36]. Defendants also filed a Motion to Strike Plaintiff's Motion for Summary

Judgment. [ECF No. 41]. The dispute concerns whether Defendants owed a duty to defend

Plaintiff in a class action lawsuit initiated by one of its former board of directors. The Court,

having reviewed the briefing and hearing oral argument finds because that suit is a single

Claim under the Policy, the Exclusion applies and coverage is barred. Thus, summary

judgment is appropriate in favor of Defendants on all claims and Defendants' Motion to

Strike is moot.

BACKGROUND

The material facts in this case, as laid out in the parties' briefing, are largely undisputed. This case arises out of a class action lawsuit brought by Joe Campbell and Barbara Campbell against Tri County Telephone Association, Inc. ("TCT"). [ECF No. 34, at 6–7]; [ECF No. 37, at 10–11]. In 2009, TCT's Board of Directors were approached with an offer to buy the cooperative from Neil Schlenker and Big Horn Telecommunications (BHT). [ECF No. 37, at 8]. TCT's Board of Directors rejected the offer based on the belief that the cooperative's worth was undervalued. *Id.*

Potential acquisitions or mergers were discussed by BHT and its related entities over the next few years. *Id.* An agreement was reached on September 19, 2014, and the parties signed two agreements forming the "Merger Transaction." *Id.* at 9; [ECF No. 34, at 5]. The Merger Transaction required approval by a two-thirds majority of the members. [ECF No. 37, at 9]. As a cooperative, members of TCT are equivalent to security holders of a private company. *Id.* Joe Campbell was on the Board of Directors at the time and opposed the Merger Transaction because he believed that TCT was being purchased for less than it was worth. *Id.* During the ninety-day voting period, Mr. Campbell tried to convince members to vote no and participated in an opposition movement. *Id.* The Merger Transaction provided that TCT's Board of Directors would resign and BHT's would take over. *Id.* at 10. On December 16, 2014, the Board of Directors conducted a meeting and passed a resolution that the Board would resign, effective December 31, 2025, at midnight, if the Merger Transaction was approved. *Id.* The Merger Transaction closed on January 2, 2015, when the Secretary of State filed the Certificate of Merger. *Id.*

2

On December 28, 2015, Joe Campbell and his wife, Barbara Campbell, filed a Complaint alleging that TCT members were "bilked out of tens of millions of dollars of value that they owned in the company" due to the Merger Transaction. *Id.* at 10–11. The case was filed on behalf of themselves and as representatives of a class of similarly situated individuals ("Campbell Class Action"). *Id.* The Complaint included TCT, Chris Davidson (TCT's Chief Executive Officer), TCT's Board (except for Mr. Campbell), BHT, and Neil Schlenker as defendants. *Id.* at 11. The claims included breaches of fiduciary duties, voting irregularities, and violation of bylaws, and conspiracy to defraud and deceive. *Id.* An Amended Complaint was filed on February 8, 2016, to include Steve Harper as a defendant. *Id.* A Second Amended Complaint was filed on December 27, 2016, which added an additional theory of liability and a cause of action for securities fraud. *Id.* Joe Campbell participated in the Campbell Class Action by initiating it, personally attending the depositions of various witnesses, engaging in motions practice, and obtaining class certification. *Id.* at 11–12. The court granted summary judgment in favor of the defendants, and the Class unsuccessfully appealed. *Id.* at 12; [ECF No. 34, at 9]. TCT paid only its defense fees and costs in connection with the Campbell Class Action. [ECF No. 37, at 12].

TCT filed a lawsuit on May 26, 2017, against the Campbells. *Id.* TCT alleged that Mr. Campbell had access to confidential, proprietary or otherwise not public information, which he shared with other individuals after the Merger Transaction was finalized. *Id.* TCT further alleged that "Defendant Joe Campbell was a member of the board of directors of TCT, as it operated as a co-operative, from February 24, 2003[,] until the co-operative's board was dissolved effective January 1, 2015." *Id.*

3

TCT obtained a Private Choice Ovation Policy ("Policy") from Twin City Fire Insurance Company ("Twin City") in 2013. *Id.* at 13. Plaintiff purchased extended coverage of the Policy, extending coverage until January 1, 2021. [ECF No. 34, at 2]. The Policy includes directors and officers coverage. [ECF No. 37, at 13]. The Policy contains several exclusions to the coverage, including an Insured versus Insured exclusion ("Exclusion"). *Id.* The Exclusion also contains carve backs that restore coverage in certain circumstances. *Id.* at 14. The carve backs include a "Security Holder Exception" and a "Former Manager Exception." *Id.* at 18. The Security Holder Exception provides that the Insured versus Insured Exclusion does not apply to "a civil proceeding by a security holder of an **Insured Entity**, in their capacity as such, that is brought and maintained without solicitation, assistance, or active participation of any Insured Entity or Manager." *Id.* The Former Manager Exception applies to:

> [A] civil proceeding by or on behalf of a former **Manager** who has not served in such capacity for at least on year prior to such **Claim** being made, provided that such **Claim** is made without the assistance, participation or solicitation of any current **Manger** or any former **Manager** who has served in such capacity during the one year prior to such Claim being made.

*Id.* at 25.

Plaintiff filed the current lawsuit alleging a claim for declaratory relief, requesting a declaration that Defendants owed a duty to defend the Campbell Class Action; a claim of breach of contract; and a claim of bad faith. [ECF No. 1]. Plaintiff and Defendants filed competing Motions for Summary Judgment. [ECF Nos. 33 & 36]. Plaintiff's Motion for Summary Judgment [ECF No. 33] argues that Defendants owed a duty to defend the Campbell Class Action because at least some of the claims were covered under the Policy.

Defendants' Motion for Summary Judgment [ECF No. 36] argues that the entirety of the Campbell Class Action falls under the Exclusion in the Policy. Defendants also filed a Motion to Strike Plaintiff's Motion for Summary Judgment [ECF No. 41], arguing that Plaintiff did not include a statement of facts within their Brief in Support and the Brief would be over the 25-page limit if Plaintiff had. The Court will first review the competing Motions for Summary Judgement before turning to the Motion to Strike.

### RELEVANT LAW

Rule 56 of the Federal Rules of Civil Procedure provides a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgement as a matter of law." A fact is material if it is necessary to determine the outcome of the case. *Roberts v. Jackson Hole Mountain Resort Corporation*, 884 F.3d 967, 972 (10th Cir. 2018). A dispute is genuine if evidence exists that it may lead a reasonable trier of fact to return a verdict for the non-moving party. *Olivero v. Trek Bicycle Corporation*, 291 F. Supp. 3d 1209, 1218 (D. Colo. 2017). When determining whether a genuine dispute of material fact exists, a court will draw all favorable inferences of factual ambiguities in favor of the non-movant. *Morlock v. United Parcel Service, Inc.*, No. 08-CV-44, 2008 WL 11411456, at *2 (D. Wyo. Oct. 9, 2008).

If a movant meets their burden in showing that no genuine dispute exists, the non-movant must submit sufficient evidence in specific factual form showing that a dispute does exist. *Id.* This requires more than a scintilla of evidence—providing more than mere assertions and conjecture. *Brennan v. Jackson Hole Snowmobile Tours, Inc.*, No. 08-CV-265, 2009 WL 10700292, at *2 (D. Wyo. Aug. 4, 2009). "[S]ummary judgment is

appropriate when the non-movant is unable to present facts on which a reasonable jury could find in his or her favor." *Id.* In sum, summary judgment is an opportunity to determine the legal sufficiency of a claim to proceed to trial, not to balance or weigh factual disputes.

When sitting in diversity, a federal court applies federal procedural law and state substantive law. *E.g., Los Lobos Renewable Power, LLC v. Americulture, Inc.*, 885 F.3d 659, 660 (10th Cir. 2018). A "federal court's task is not to reach its own judgement regarding the substance of common law, but simply to 'ascertain and apply the state law'" using the "most recent decisions of the state's highest court." *Wade v. EMASCO Ins. Co.*, 483 F.3d 657, 665–66 (10th Cir. 2007) (quoting *Wankier v. Crown Equip, Corp.*, 353 F.3d 862, 866 (10th Cir. 2003)). However, "'[w]here no controlling state decision exists, [a] federal court must attempt to predict what the state's highest court would do.'" *Id.* at 666 (quoting *Wankier*, 353 F.3d at 866). "In doing so, it may seek guidance from decisions rendered by lower courts in the relevant state, appellate decisions in other states with similar legal principles, district court decisions interpreting the law of the state in question, and the general weight and trend of authority in the relevant area of law." *Id.* (internal citations and quotations omitted).

## RULING OF THE COURT

## I.     Motions for Summary Judgment

Both parties filed competing Motions for Summary Judgment. [ECF No. 33 & 36]. The material facts in this case, as laid out in the parties' briefing, are largely undisputed. Both parties agree on the dates of the events surrounding the merger and the board's

resignation. *See* [ECF No. 37, at 10]; [ECF No. 40, at 4 –5]; [ECF No. 34, at 5–6]. The exact date that Mr. Campbell stopped serving as a director is disputed, but it is not a genuine dispute of a material fact and is instead a question of law. The parties' dispute is based on the definition of "served" under the Policy. *See* [ECF No. 40, at 4–5]; [ECF No. 42, at 17–18]. Similarly, all other material issues are questions of law. Therefore, there is no genuine dispute of material fact, and the case is fit for summary judgement. *See Roberts*, 884 F.3d at 972.

Plaintiff's Complaint alleges three causes of action, including declaratory relief, requesting a declaration that Defendants owed a duty to defend the Campbell Class Action; a claim of breach of contract; and a claim of bad faith. [ECF No. 1]. The Court will evaluate each of Plaintiff's three claims in turn.

### A. Duty to Defend

Whether an insurer has a duty to defend is not determined "on the basis of the ultimate liability of the insurer to indemnify the insured or on the basis of whether the underlying action is groundless or unsuccessful." *Aetna Ins. Co. v. Lythgoe*, 618 P.2d 1057, 1061 (Wyo. 1980) (citing *Employers' Fire Insurance Company v. Beals*, 103 R.I. 623, 240 A.2d 397 (1968); *Burger v. Continental National American Group*, 6th Cir., 441 F.2d 1293 (1971)). "The obligation to defend is an independent consideration in liability insurance, and it is invoked by any claim alleged in the complaint that is potentially covered under the policy." *Shoshone First Bank v. Pac. Emps. Ins. Co.*, 2 P.3d 510, 514 (Wyo. 2000) (citing *First Wyoming Bank, N.A., Jackson Hole v. Continental Ins. Co.*, 860 P.2d 1094, 1099–1100 (Wyo.1993)). The insurer has a duty to defend "as long as the alleged claim

rationally falls within the policy coverage." *Id.* at 513–14 (citing *Hutchinson Oil Co. v. Federated Service Ins. Co.*, 851 F. Supp. 1546, 1553 (D. Wyo. 1994)). The Wyoming Supreme Court also held that "the insurer must defend the entire action" unless the policy "provides for allocation of defense costs in the instance in which some claims are covered and some are not." *See Shoshone First Bank*, 2 P.3d at 517.

Plaintiff argues that "Twin City's reliance on the 'Insured v. Insured' exclusion was wrong for several reasons, any one of which would provide defense coverage to TCT." [ECF No. 35, at 5]. Defendants argue that "[u]nder the Policy's plain language and the overwhelming weight of authority enforcing materially identical provisions, the Exclusion precludes coverage for the Campbell Class Action in its entirety." [ECF No. 37, at 8].

### i.    Policy Interpretation

Under Wyoming law, the "established rules of contract interpretation apply to insurance policies." *N. Fork Land & Cattle, LLLP v. First Am. Title Ins. Co.*, 2015 WY 150, ¶ 14, 362 P.3d 341, 346 (Wyo. 2015) (quoting *Doctors' Co. v. Ins. Corp. of America*, 864 P.2d 1018, 1023 (Wyo. 1993)). Interpretation of an insurance policy is "the process of ascertaining the meaning of the words used to express the intent of the parties." *Id.* (quoting *Doctors' Co.*, 864 P.2d at 1023). Wyoming courts determine intent "by considering the instrument which memorializes the agreement of the parties as a whole." *Doctors' Co.*, 864 P.2d at 1023 (citing *Klutznick v. Thulin*, 814 P.2d 1267, 1270 (Wyo. 1991)). The Wyoming Supreme Court has held that in the interpretation of insurance policies "words used are given the plain meaning that a reasonable person, in the position of the insured, understands them to mean." *N. Fork Land & Cattle, LLLP*, 362 P.3d at 346; *see Worthington v.*

*State*, 598 P.2d 796, 806 (Wyo. 1979) (quoting *Doctors' Co.*, 864 P.2d at 1023); *Wilson v. Hawkeye Casualty Co.*, 67 Wyo. 141, 215 P.2d 867, 873–74 (1950). The "examination is confined to the 'four corners' of an integrated contract and extrinsic evidence is not admitted to contradict the plain meaning" when the language is unambiguous. *Doctors' Co.*, 864 P.2d at 1023–24 (citing *Prudential Preferred Properties v. J and J Ventures, Inc.*, 859 P.2d 1267, 1271 (Wyo. 1993)). Language is ambiguous "if it is capable of more than one reasonable interpretation." *Id.* at 1023 (citing *Helfand v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, 13 Cal. Rptr. 2d 295, 299 (Cal. Ct. App. 1992)). The Wyoming Supreme Court held that courts must "avoid interpreting provisions in a way that makes the other provisions inconsistent or meaningless." *Gumpel v. Copperleaf Homeowners Ass'n, Inc.*, 393 P.3d 1279, 1290 (Wyo. 2017).

Defendants argue that the entire "Campbell Action is a single Claim under the Policy, not a series of separate claims that can be parsed by complaint, plaintiff, defendant, or cause of action." [ECF No. 37, at 18].

### 1.  Definition of "Claim" in the Exclusion

The Exclusion at issue provides that "[t]he Insurer shall not pay Loss: . . . in connection with any **Claim** brought or maintained by or on behalf of any **Insureds** (in any capacity) or any security holder of an **Insured Entity**." [ECF No. 37, at 13–14]. The term "**Claim**" is defined as "any (1) **Insured Person Claim**; (2) **Entity Claim**; (3) **Derivative Demand**." [ECF No. 34, at 3]. An "**Entity Claim**" is defined under the Policy as a "civil proceeding . . . commenced by the service of a complaint, filing of a demand for arbitration, or similar pleading . . . against an **Insured Entity**." [ECF No 37, at 13].  An "**Insured**

**Person Claim**" is defined under the Policy as a "civil proceeding . . . commenced by the service of a complaint, filing of a demand for arbitration, or similar pleading . . . against an **Insured Person**." *Id.* Defendants argue that "[u]nder the Policy language, the Campbell Class Action is a **Claim** because it is a civil proceeding." (emphasis omitted). Plaintiff argues that "Twin City's interpretation of the Policy leads to the 'nutty' or 'whacky' result that all **Claims**, including those that would be expected to be covered, are excluded if only a single, inconsequential **Claim** is found within the exclusionary language." [ECF No. 40, at 9]. Plaintiff cites to *Level 3 Communications, Inc. v. Federal Insurance Co.* for the proposition that the Campbell Class Action is a covered Claim. 168 F.3d 956 (7th Cir. 1999).

In *Level 3*, the Seventh Circuit analyzed an insurance policy that included directors and officers coverage in connection with a class action lawsuit. *Id.* The policy contained an Insured versus Insured exclusion that precluded liability for any "Claim made against an Insured Person" when the Claim was "brought or maintained by or on behalf of any Insured." *Id.* at 957. There were eight plaintiffs, and one was a former director who joined the suit six months after it was filed. *Id.* The Seventh Circuit concluded that "the contract clearly excludes coverage for the part of the settlement . . . allocable to [the former director]." *Id.* at 958. The plaintiff in *Level 3* argued, that the "exemption can't mean what it says, because if it did then even if [the former director] were merely an unnamed class member in a securities class action, with a stake of $10 in the outcome of the suit, and even if he had resigned his directorship in a subsidiary of [the insured] 20 years ago, [the insured] would lose its insurance coverage." *Id.* The *Level 3* court noted that "[W]hen the

application of a rule leads to a truly whacky result, a more than suspicion arises that the parties can't have set *so* high a value on clarity that they would have thought such an application a proper interpretation of the rule." *Id.* The court then turned to the policy's allocation provision and ultimately allocated loss between covered and uncovered matters in the underlying lawsuit. *Id.* at 960–61. The *Level 3* court contended that a director being a principal plaintiff would not make a difference in the outcome of the case because the allocation provision in the policy would provide for allocation between any covered and uncovered loss. *Id.* at 960.

Defendants argue that if the claims were allocated, "the Security Holder and Former Manager Exceptions would be rendered meaningless." [ECF No. 42, at 12]. Plaintiff contends, however, that "Twin City's interpretation would further render the allocation clause essentially meaningless." [ECF No. 40, at 9]. The Court must "presume each provision in a contract has a purpose, and . . . avoid interpreting a contract so as to find inconsistent provisions or so as to render any provision meaningless." *Claman v. Popp*, 279 P.3d 1003, 1013 (Wyo. 2012) (citing *Scherer v. Laramie Reg'l Airport Bd.*, 236 P.3d 996, 1003 (Wyo. 2010)); *Gumpel*, 393 P.3d at 1290. The allocation clause must be interpreted by reading the Policy as a whole. *See Doctors' Co.*, 864 P.2d at 1023 (citing *Klutznick*, 814 P.2d at 1270).

The Policy states that "100% of the **Insured's Defense Costs** shall be allocated to covered **Loss**" when there is a covered Claim. [ECF No. 37-26, at 13]. It further states that "all other **Loss** shall be allocated." [ECF No. 40, at 9]. The allocation clause only applies when there is a covered Claim. The Exception provides that "[t]he Insurer shall not pay

**Loss**: . . . in connection with any **Claim** brought or maintained by or on behalf of any **Insureds** (in any capacity) or any security holder of an **Insured Entity**." [ECF No. 37, at 13–14]. The allocation clause is not meaningless, as it is only limited by the Exclusion. *See Jerry's Enters., Inc. v. U.S. Specialty Ins. Co.*, 845 F.3d 883, 890 (8th Cir. 2017) ("Our holding, on the other hand, does not read the allocation clause out of the contract. It simply limits the reach of the allocation clause when more specific language exists elsewhere in the contract."). Plaintiff argues that if "there are any claims properly excluded by the Insured versus Insured provisions of the Policy, the proper result is to require a defense but apply the allocation clause to indemnify only the claims that are not excluded." [ECF No. 40, at 10]. While the *Level 3* court allocated the loss of the covered and uncovered claims instead of finding that the entire civil proceeding was one claim, this case can be distinguished.

Here, the Policy includes an allocation clause, but it also includes an Exclusion and exceptions to the Exclusion. *See Gregory v. Navigators Ins. Co.*, No. 22-CV-4834 (VEC), 2022 WL 17551995, at *6–7 (S.D.N.Y. Dec. 9, 2022) ("In reaching that conclusion, however, the *Level 3* court did not discuss any exceptions in the policy to the insured vs. insured exclusion"); *Tarter v. Navigators Ins. Co.*, No. 5:20-240-KKC, 2021 WL 149302, at *9 (E.D. Ky. Jan. 15, 2021) ("While the [Directors and Officers] policy in *Level* 3 included both an [Insured versus Insured] Exclusion and an allocation clause, the [Insured versus Insured] Exclusion did not have an assistance exception like the one in the instant case."); *Jerry's Enters., Inc.*, 845 F.3d at 890. The Policy includes a Security Holder Exception and a Former Manager Exception. [ECF No. 37, at 14]. The Security Holder

Exception states that the Claim must be "brought and maintained without the solicitation, assistance, or active participation of any **Insured Entity** or **Manager**." *Id.* Similarly, the Former Manager Exception states that the Claim must be made "without the assistance, participation or solicitation of any current **Manager** or any former **Manager** who has served in such capacity during the one year prior to such **Claim** being made." *Id.*

In *Sphinx International, Inc. v. National Union Fire Insurance Co.*, the Eleventh Circuit analyzed similar policy language and determined that the claim was rightfully excluded, distinguishing *Level 3* because the former director was the principal plaintiff and the policy exclusion applied unless the claim was brought "without the solicitation of, or assistance of, or active participation of, or intervention of" a director. 412 F.3d 1224, 1229–31 (11th Cir. 2005). The *Sphinx* court, however, did not discuss an allocation clause. *Jerry's Enters., Inc.*, 845 F.3d at 890; *see Sphinx International, Inc.*, 412 F.3d 1224. When policies include an allocation clause, courts have still distinguished *Level 3* and held that policy exclusions with similar exceptions and definitions of "Claim" apply to the entire proceeding, not just to some of the causes of action. *Jerry's Enters., Inc.*, 845 F.3d at 888 (holding that because "Claim" was defined as a "civil proceeding," there was "no room under the language of the exclusion clause to apply the clause to some parts of a lawsuit but not others"); *Tarter*, 2021 WL 149302, at *4 ("This Court finds the reasoning in *Jerry's Enterprises* most instructive because, like the instant case, the [Directors and Officers] policy implicated there contained *both* a similarly worded [Insured versus Insured] Exclusion with an assistance exception *and* an allocation clause."); *Stoneburner v. RSUI Indemnity Co.*, 598 F. Supp. 3d 1292, 1296 (D. Utah 2022); *TD Williamson Inc. v. Federal*

13

*Ins. Co.*, No. 20-CV-571-GKF-JFJ, 2021 WL 2117054, at *3–5 (N.D. Okla. May 25, 2021); *Gregory*, 2022 WL 17551995, at *5.

Courts reasoned that "applying the allocation clause . . . would render the . . . exception superfluous, effectively reading that exception out of the contract." *Jerry's Enters., Inc.*, 845 F.3d at 890 (citing *PowerSports, Inc. v. Royal & Sunalliance Ins. Co.*, 307 F.Supp.2d 1355, 1362 (S.D. Fla. 2004)); *see Tarter*, 2021 WL 149302, at *8. Courts have further reasoned that when a specific provision conflicts with a general one, the specific governs. *See Gregory*, 2022 WL 17551995, at *7 ("The Allocation Clause . . . does not expressly address claims brought by an insured and others. Such claims are expressly governed by the [Insured versus Insured] Exclusion."); *Tarter*, 2021 WL 149302, at *8 ("The [Insured versus Insured] Exclusion, which specifically references Claims brought by Insured Persons against another Insured, controls over the allocation clause, which only generally references Claims with 'covered and uncovered matters.'"); *Jerry's Enters., Inc.*, 845 F.3d at 887–88.

Plaintiff argues that "[t]he 'Insured v. Insured' concerns about a lawsuit involving collusion or a 'family dispute' were not present in the underlying lawsuit." [ECF No. 35, at 6]. The two purposes of Insured versus Insured provisions acknowledged by courts are to exclude "coverage both of collusive suits . . . and of suits arising out of those particularly bitter disputes that erupt when members of a corporate, as of a personal, family have a falling out and fall to quarreling." *Level 3 Communications, Inc.*, 168 F.3d at 958. The second purpose applies here because the underlying lawsuit arose out of a "bitter dispute" from the falling out between Mr. Campbell and TCT. Even if the typical purpose of an

Insured versus Insured provision was not found here, courts are to look at and effectuate the plain meaning of the policy language, not the purpose of a provision. *See N. Fork Land & Cattle, LLLP*, 362 P.3d at 346 ("[W]ords used are given the plain meaning that a reasonable person, in the position of the insured, understands them to mean."); *Int'l Surplus Lines Ins. Co. v. Univ. of Wyo. Rsch. Corp.*, 850 F. Supp. 1509, 1519–20 (D. Wyo. 1994); *see also Kan. Heart Hosp., L.L.C. v. Exec. Risk Indem., Inc.*, No. 06-1345-MLB, 2008 WL 11443101, at *19 (D. Kan. July 7, 2008) (rejecting the argument that the purpose of the exclusion was relevant); *Level 3 Communications, Inc.*, 168 F.3d at 958 (holding that "[i]t is apparent from the wording they chose that the parties opted for the rule, not the standard, in agreeing to the 'Insured versus Insured' exclusion.").

The Exclusion at issue is broader than a typical Insured versus Insured provision, as the Exclusion also includes any "**Claim**" brought by security holders. [ECF No. 42, at 14]. Under the Policy, the meaning of the term "**Claim**" is defined as a "civil proceeding." [ECF No. 37, at 13]. The plain meaning of the term "**Claim**" is unambiguous because there is not "more than one reasonable interpretation." *See Doctors' Co.*, 864 P.2d at 1023 (citing *Helfand*, 13 Cal. Rptr. 2d 295, 299 (Cal. Ct. App. 1992)); *see also Jerry's Enters., Inc.*, 845 F.3d at 888 (holding that because "Claim" was defined as a "civil proceeding," there was "no room under the language of the exclusion clause to apply the clause to some parts of a lawsuit but not others"). While Plaintiff argues there are distinct types of Claims defined in the Policy [ECF No. 40, at 12, 14–15], all the underlying claims could potentially be excluded from coverage based on Mr. Cambell's involvement as a former director and a principal plaintiff because of the interrelationship between the claims.

The Policy states that "[a]ll **Claims** based upon, arising from or in any way related to the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to be a single **Claim** for all purposes under this Policy first made on the earliest date that: (A) any of such claims was first made[.]" [ECF No. 42, at 20] (alterations in original). The Policy further defines "**Interrelated Wrongful Acts**" as "**Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, goal, motive, methodology, or cause or series of causally connected facts, circumstances, situations, events, transactions, goals, motives, methodologies or causes." *Id.*; [ECF No. 40, at 13].

Plaintiff argues that "Mr. Harper was entitled to coverage when he was sued regardless of the coverage analysis of the other **Insureds** and the separate **Claims** against them." [ECF No. 40, at 10]. Plaintiff further argues "[t]he fact that the Campbell Class Action may be viewed as a single civil proceeding does not overcome the Policy's separate definitions of different types of **Claims**, any of which may be 'commenced' at different times throughout the course of that single civil proceeding." *Id.* at 12. Defendants argue that the claims against Mr. Harper are still excluded even if it is initially considered a separate claim because all the underlying claims in the Campbell Class Action are **Interrelated Wrongful Acts**. [ECF No 42, at 20].

The Policy defines "**Wrongful Act**" as "any actual or alleged: (1) error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed by an Insured Person in their capacity as such or in their Outside Capacity, or, with regard to Insuring Agreement (C) an Insured Entity; or (2) matter claimed against an Insured Person, solely by reason of their serving in such capacity, including service in an Outside

Capacity." [ECF No. 40, at 13–14]; [ECF No. 42, at 20 n.5]. Plaintiff argues that **Wrongful Acts** are committed by "*an*" **Insured Person**, and "the Wrongful Acts that may be aggregated into a single **Claim** can only be the **Wrongful Acts** that [Mr. Harper] was alleged, in the first amended complaint, to have committed. [ECF No. 40, at 13]. The Policy states that a "**Wrongful Act**" is committed by "an **Insured Person**," but "**Interrelated Wrongful Acts**" are "**Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, goal, motive, methodology, or cause or series of causally connected facts, circumstances, situations, events, transactions, goals, motives, methodologies or causes." [ECF No. 42, at 20]. **Wrongful Act**s in the definition of **Interrelated Wrongful Acts** is plural, meaning more than one "actual or alleged" act by "an **Insured Person.**" [ECF No. 40, at 13–14]; [ECF No. 42, at 20 n.5]. An "**Insured Person**" is "any (1) **Manager**; or (2) **Employee**." [ECF No. 34, at 4].

While Plaintiff argues that under the Policy, plural definitions mean the same as the original definition [ECF No. 40, at 14], the definition now exists more than once. More than one act by "an **Insured Person**" does not require it to be the same "**Insured Person**." When reading the definitions together, the words "an **Insured Person**" do not support Plaintiff's proposition that the claims can only be aggregated against one singular "**Insured Person**." Therefore, the claims against Mr. Harper are Interrelated Wrongful Acts that form a single Claim along with the underlying claims against the original defendants. Similarly, all the claims against the original defendants form a single **Claim** because there is "a common nexus . . . [of] fact, circumstance, situation, event, transaction, goal, motive, methodology, or cause or series of causally connected facts, circumstances, situations,

17

events, transactions, goals, motives, methodologies or causes." *See* [ECF No. 42, at 20]; [ECF No. 40, at 13].

The First Amended Complaint in the Campbell Action was filed on February 8, 2016, and included the same general allegations but added Steve Harper as a Defendant. [ECF No. 34, at 6]. The Second Amended Complaint was filed on December 27, 2016, and added "aiding and abetting" as a cause of action for securities fraud. *Id.* Both the addition of Mr. Harper in the First Amended Complaint and the additional theory of liability in the Second Amended Complaint arose from the same "common nexus" of fact, as all the general allegations from the original complaint were the same. Therefore, all the claims in the underlying proceeding are one single Claim under the Policy that falls under the Exclusion.

### 2. Carve-Outs Under the Policy

The Policy includes carve-outs to the Insured versus Insured Exclusion. [ECF No. 37, at 13]. Those include a "Security Holder Exception" and a "Former Manager Exception." [ECF No. 37, at 23].

#### a. Security Holder Exception

The Security Holder Exception provides that the Exclusion does not apply to "a civil proceeding by a security holder of an **Insured Entity**, in their capacity as such, that is brought and maintained without solicitation, assistance, or active participation of any **Insured Entity** or **Manager**[.]" *Id.* (alteration in original). Defendants argue that the Security Holder Exception does not apply because Campbells were not acting solely in their capacities as security holders when they brought the suit. *Id.* at 24.

18

The Campbells brought the Class Action on behalf of 825 cooperative members. [ECF No. 40, at 6]. Defendants acknowledge that cooperative members are the equivalent of security holders [ECF No. 37, at 9], but Defendants argue that the Campbells had a personal stake in the case. *Id.* at 24–25. Regardless of any personal motivations that the Campbells had in bringing the suit, the basis of the suit was in their capacity as security holders. The Campbells sued as "former cooperative members" for the alleged underpayment of their shared one-member interest. [ECF No. 40, at 5].

Defendants further argue that the proceeding was not "brought and maintained without solicitation, assistance, or active participation of any **Insured Entity** or **Manager**" because the suit was brought and maintained by the Campbells with active participation of Mr. Campbell. [ECF No. 37, at 23–24]. Plaintiff argues that "[i]t is unreasonable to read the Policy, as Twin City has, precluding coverage on the basis that Campbell has solicited himself, assisted himself, or actively participated with himself in bringing or maintaining a claim." [ECF No. 40, at 15]. Plaintiff further argues that "[t]he plain language of the Policy requires, at minimum, a second actor who either solicits, assists, or actively participates with the security holder in the bringing or maintaining of the security holder's claim, and that is not the case here." *Id.*

The Policy language provides that the Security Holder Exception does not apply if there is "solicitation, assistance, or active participation of any **Insured Entity** or **Manager**[.]" [ECF No. 37, at 23] (alteration in original). "**Manager**" means "any natural person who *was, is or shall become* a(n): (1) duly elected or appointed director, advisory director, board observer, advisory board member, officer, member of the board of

managers or management committee member of an **Insured Entity**[.]" *Id.* at 14 (second alteration in original). Mr. Campbell was a manager and had "intimate" knowledge of the merger. *Id.* at 24–25. Mr. Campbell actively participated in the lawsuit by initially bringing the suit and attending the depositions of witnesses. *Id.* at 11–12. Mrs. Campbell also brought and maintained the lawsuit. *Id.* at 10–11.

With a plain reading of the word "participation," it is enough that Mr. Campbell participated alone in the lawsuit under the Policy language. Black's Law Dictionary defines participation as "[t]he act of taking part in something, such as a partnership, a crime, or a trial." *Participation*, BLACK'S LAW DICTIONARY (12th ed. 2024). Mr. Campbell took part in the proceeding by initially bringing the suit and attending the depositions of witnesses. [ECF No. 37, at 11–12]. Even if Plaintiff's argument regarding the necessity of a second actor was true, Mrs. Campbell would meet that requirement. Because of Mr. Campbell's involvement, the proceeding was not "brought and maintained without solicitation, assistance, or active participation of any **Insured Entity** or **Manager**." *See id.* at 23. Therefore, the Security Holder Exception does not apply.

### b. Former Manager Exception

The Former Manager Exception applies to:

> [A] civil proceeding by or on behalf of a former **Manager** who has not served in such capacity for at least one year prior to such **Claim** being made, provided that such **Claim** is made without the assistance, participation or solicitation of any current **Manger** or any former **Manager** who has served in such capacity during the one year prior to such **Claim** being made.

[ECF No. 37, at 25]. Defendants argue that the Former Manager Exception does not apply because Mr. Campbell served as a director within one year of the Campbell Class Action

being filed. *Id.* Plaintiff argues that Mr. Campbell did not "serve in that capacity" during the one year prior to the lawsuit being filed. [ECF No. 40, at 17].

The Resignation date by Board resolution was set for December 31, 2015, if the Merger Transaction was approved. [ECF No. 37, at 10]. The Merger Transaction closed on January 2, 2015, when the Secretary of State filed the Certificate of Merger. *Id.* Either of these options leaves less than 365 days between the date that the Board resigned or officially stopped serving and the lawsuit, as it was filed on December 28, 2015. Plaintiff argues, however, that "the focus must be on when Mr. Campbell last took any action in the capacity of a director." [ECF No. 40, at 17]. Plaintiff further argues that "[t]his interpretation is consistent with the Tenth Circuit's holding in *Serman v. Unigard Mut. Ins. Co.*" *Id.* The *Serman* court held that "[t]he paramount question is not whether Mellies was a real estate manager, for that has been conceded, but whether he was acting in that capacity at the time of appellant's injury." *Serman v. Unigard Mut. Ins. Co.*, 504 F.2d 33, 35 (10th Cir. 1974).

The language of the policy at issue in *Serman* provided "that a real estate manager is insured only while acting in that capacity for the named insured." *Id.* Here, however, the Policy provides that the Former Manager Exception applies only when the former Manager "has not *served* in such capacity for at least one year prior to such **Claim** being made." [ECF No. 37, at 25] (emphasis added). When looking at the plain meaning of the word "serve," Merriam-Webster defines the term as "to hold an office." *Serve*, MERRIAM-WEBSTER, https://www.merriamwebster.com/dictionary/serve. Further, Wyoming Statute 17-19-805(d) supports this meaning, as it provides that "[d]espite the expiration of a

21

director's term, the director continues to serve until the director's successor is elected, designated or appointed and qualifies, or until there is a decrease in the number of directors."

The Resignation date by Board resolution was set for December 31, 2015, if the Merger Transaction was approved. [ECF No. 37, at 10]. The Merger Transaction closed on January 2, 2015, when the Secretary of State filed the Certificate of Merger. *Id.* Either of these options leaves less than 365 days between the date that Mr. Campbell stopped serving as a Manager and the date that the Campbell Class Action was filed. Therefore, Mr. Campbell served in the capacity as a Manager within one year of commencing the Campbell Class Action. None of the exceptions preclude the application of the Exclusion to the Campbell Class Action, and Defendant's did not have a duty to defend because the entire civil proceeding was excluded from coverage.

### B. Bad Faith

Under Wyoming law, "[t]he duty owed to an insured is characterized by the nature of the claim." *Darlow v. Farmers Ins. Exch.*, 822 P.2d 820, 827 (Wyo. 1991). The duty is characterized as a third-party claim "[w]hen the benefit derives from the insurer's duty to defend the insured against third-party actions." *Id.* (citing *Farmers Group, Inc. v. Williams*, 805 P.2d 419, 421 (Colo.1991)). However, a claim is characterized as a first-party claim "when the insured makes a claim against his insurer for benefits accruing directly from the insurance contract." *Id.* (citing *Farmers Group, Inc.*, 805 P.2d at 421).

Defendants argue "TCT cannot bring a claim for first-party bad faith because it never brought a direct claim for benefits under the Policy; instead, it sought a defense

against a third-party's actions in bringing the Campbell Class Action." [ECF No. 37, at 27]. Plaintiff argues that the Court should look to the substance of the claim, not the label. [ECF No. 40, at 18]. Defendants cite cases regarding the two distinct claims; however, the cases do not support the proposition that the claim should not be considered if erroneously mislabeled. Instead, the cases only note that first-party and third-party claims are separate and distinct claims or that the record does not support a third-party claim. *See Jarvis v. Farmers Ins. Exch.*, 948 P.2d 898, 901 (Wyo. 1997) (where the Wyoming Supreme Court notes that "reliance on the language in cases describing the duty of the insurer in first-party bad faith actions will not apply when deciding whether, apart from duty, an excess judgment is a prerequisite in third-party bad faith actions); *Darlow*, 822 P.2d at 827 (distinguishing the two claims, as "[t]he duty owed to an insured is often characterized by the nature of the claim"); *Applegate v. State Farm Mut. Auto. Ins. Co.*, 61 F. App'x 552, 556 (10th Cir. 2003) (affirming the district court because the plaintiff "assured the court that his bad faith claim was unrelated to any third-party claim" and that the "bad faith claim relates to State Farm's handling of his *first*-party UM claim.").

Plaintiff argues that "TCT's bad faith claim survives as a third-party claim." [ECF No. 40, at 19]. Plaintiff supports this contention by citing to case law that states Wyoming considers "'the facts alleged in the complaint' rather than 'the label counsel applied to a particular cause of action.'" *Id.* at 18; *see Emps. Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1174 n.16 (10th Cir. 2010) (citing *Matlack v. Mountain W. Farm Bureau Mut. Ins. Co.*, 44 P.3d 73, 78 (Wyo. 2002)). This Court agrees that even if Plaintiff labeled the

bad faith claim incorrectly, the claim must be considered by the factual allegations in the Complaint.

Third-party bad faith claims exist "when a liability insurer fails in bad faith to settle a third-party claim within policy limits against its insured." *Jarvis v. Farmers Ins. Exch.*, 948 P.2d 898, 900 (Wyo. 1997) (citing *Herrig v. Herrig,* 844 P.2d 487, 490 (Wyo. 1992). In Wyoming, "no third-party bad faith cause of action for failure to settle will accrue against an insurer until entry of a judgment against the insured in excess of policy limits." *Gainsco Ins. Co. v. Amoco Prod. Co.*, 2002 WY 122, ¶ 16, 53 P.3d 1051, 1059 (Wyo. 2002); *see Jarvis*, 948 P.2d at 901–02; *Sabins v. Commercial Union Ins. Companies*, 82 F. Supp. 2d 1270, 1278 (D. Wyo. 2000). The standard for third-party bad faith claims "is whether a prudent insurer would have accepted the settlement offer if it alone were to be liable for the entire judgment." *Gainsco Ins. Co. v. Amoco Prod. Co.*, 2002 WY 122, ¶ 13, 53 P.3d 1051, 1058 (Wyo. 2002) (quoting *Betts v. Allstate Ins. Co.*, 201 Cal. Rptr. 528, 538 (Cal. Ct. App. 1984)). Plaintiff did not make any factual allegations in its Complaint about settling the underlying lawsuit. Instead, Plaintiff alleged "Defendants acted in bad faith basis when it unreasonably denied a defense to TCT." [ECF No. 1, at 15].

Further, all of Defendants' arguments and analysis of bad faith, related to the duty to defend, refer to the first-party standard. *See* [ECF No. 37, at 28]. Defendants cite to *Darlow* for the premise that Plaintiff's claim should be a third-party claim. [ECF No. 37, at 27]. *Darlow* provides that "[t]he duty of good faith and fair dealing announced in *McCullough* applies to first-party claims." *Darlow*, 822 P.2d at 827 (citing *McCullough v. Golden Rule Ins. Co.*, 789 P.2d 855 (Wyo.1990)). The standard for first-party bad faith

24

claims "is the objective standard of whether or not the validity of the denied claim was fairly debatable." *Id.* at 823 (citing *McCullough*, 789 P.2d at 860). This standard requires that a plaintiff "show the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim." *Id.* at 823–24 (quoting *McCullough*, 789 P.2d at 860). Defendants apply this first-party standard in their analysis of Plaintiff's bad faith claim for failure to defend the Campbell Class Action. [ECF No. 37, at 28]. Further, the cases that Defendants cite also apply the first-party standard when reviewing a claim for bad faith in the context of the duty to defend. *See First Wyo. Bank, N.A., Jackson Hole v. Cont'l Ins. Co.*, 860 P.2d 1094, 1101 (Wyo. 1993); *McKenney v. Fed. Ins. Co.*, No. 12–CV–131–F, 2013 WL 12284573, at *7 (D. Wyo. Jan. 28, 2013); *Hutchinson Oil Co. v. Federated Service Insurance Co.*, 851 F. Supp. 1546, 1557 (D. Wyo. 1994)

Regardless of the claim's label, the claim fails as a matter of law because Plaintiff has not shown "the absence of a reasonable basis" for denial. *See Darlow*, 822 P.2d at 823–24 (quoting *McCullough*, 789 P.2d at 860). Defendants argue that "TCT has not—and cannot—identify controlling authority interpreting Wyoming law that would clearly preclude application of the Exclusion." [ECF No. 37, at 28]. Plaintiff argues that "the plain language of the Policy, as would be read and understood by a reasonable insured, does not exclude coverage for **Claims** arising from the Campbell Class Action." [ECF No. 40, at 18]. But as discussed above, the Court finds that the Policy language excludes the entirety of the underlying civil proceeding. Therefore, Plaintiff has not shown that there was an absence of a reasonable basis for denial.

Wyoming has also recognized "procedural bad faith" claims. *Cornhusker Cas. Co. v. Skaj*, 786 F.3d 842, 857 (10th Cir. 2015) (citing *Sonnett v. First Am. Title Ins. Co.*, 309 P.3d 799, 806–07 (Wyo. 2013)). Procedural bad faith claims focus on "whether a claim was properly investigated and whether the results of the investigation were subjected to a reasonable evaluation and review." *Id.* at 859 (quoting *Hatch v. State Farm Fire & Cas. Co.*, 842 P.2d 1089, 1093 (Wyo. 1992)). "[U]nless it is evident that the insurer performed *no* form of satisfactory investigation, a procedural bad-faith claim will not be viable." *Id.* (citing *Sonnett*, 309 P.3d at 807). "[T]he Wyoming Supreme Court has required a 'compelling' factual showing and has declined to find even a 'cursory examination of the case' or a 'delay . . . showing [the insurer] drug its heels' sufficient to establish procedural bad faith." *Id.* (quoting *Matlack*, 44 P.3d at 81). The misconduct typically must rise to an "egregious level," and Plaintiff has not overcome the "high hurdle." *See Cornhusker Cas. Co.*, 786 F.3d at 859.

Here, Plaintiff provides few factual allegations or evidence of Defendants' investigation and review, but what it does provide supports the position that Defendants at least completed a cursory investigation. Plaintiff provides emails between TCT and Hartford Financial Products, where a request for a review was made in January of 2016. [ECF No. 34-1]. Plaintiff also provided a letter from Hartford Financial Products to Steve Harper on September 28, 2016, regarding the request for review. *Id.* Within that letter, Hartford Financial Products provided its reasoning that the claim was excluded from coverage. *Id.* The letter provided extensive information, including background information, information regarding the Policy, and a coverage analysis that discussed the

26

known facts along with the Exclusion and Exceptions. *Id.* Defendants also provided a second letter that was sent to Steve Harper on March 24, 2017, supplementing the initial letter. It is Plaintiff's burden to show that there was "*no* form of satisfactory investigation." *Cornhusker Cas. Co.*, 786 F.3d at 859 (citing *Sonnett*, 309 P.3d at 807). Plaintiff has not done so. Further, the conduct shown "does not constitute 'oppressive' or 'unreasonable' claims practices, or ones undertaken 'to gain an unfair advantage.'" *Id.* at 860 (citing *Hatch v. State Farm Fire & Cas. Co.*, 842 P.2d 1089, 1099 (Wyo.1992)).

Plaintiff also alleges that Defendants violated the Wyoming Unfair Claims Settlement Practices Act [ECF No. 37, at 28 n.7]; [ECF No. 1, at 15]. The Wyoming Supreme Court held that the Act does not create a private right of action. *Herrig v. Herrig*, 844 P.2d 487, 493 (Wyo. 1992). Therefore, in sum, Plaintiff has no viable bad faith claim.

## C. Breach of Contract

The elements of a breach of contract claim are "a lawfully enforceable contract, an unjustified failure to timely perform all or any part of what is promised ..., and entitlement of [the] injured party to damages." *Peterson v. Meritain Health, Inc.*, 2022 WY 54, ¶ 22, 508 P.3d 696, 705 (Wyo. 2022) (quoting *Halling v. Yovanovich*, 2017 WY 28, ¶ 13, 391 P.3d 611, 616–17 (Wyo. 2017)). Here, there was not an "unjustified failure to timely perform all or any part of what [was] promised." *See id.* (quoting *Halling*, 391 P.3d at 616–17). Neither party addressed the breach of contract claim in their briefings. Regardless, the breach of contract claim is not viable because this Court has found that Defendants did not have a duty to defend.

## II.    Motion to Strike

Defendants filed a Motion to Strike [ECF No. 41], arguing that the Statement of Facts [ECF No. 34] and Plaintiff's Brief in Support of Motion for Summary Judgment [ECF No. 35] are above the 25-page limit when combined. [ECF No. 41, at 4]. Defendants also argue that the Court should strike Plaintiff's Motion for Summary Judgment because the Statement of Facts was not included in the Brief, as required by the local rules. *Id.* Because the Court is granting Defendant's Motion for Summary Judgment, the Court finds the Motion to Strike moot.

CONCLUSION

Because the entirety of the civil proceeding is excluded from coverage, Defendant's Motion for Summary Judgment is granted and Defendants' Motion to Strike is denied as moot.

**NOW, THEREFORE IT IS ORDERED** that Defendants' Motion for Summary Judgment is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion to Strike is **DENIED**.

Dated this 12th day of January, 2026.

_____
Kelly H. Rankin
United States District Judge

28